**UNITED STATES ex rel. Burton GRAHAM, Relator-Appellant,**

v.

**Vincent R. MANCUSI, Warden, Attica State Prison, and the State of New York, Respondents-Appellees.**

No. 378, Docket 71-1513.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1972.

Decided Jan. 28, 1972.

---

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City), for appellant.

Robert S. Hammer, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City), for appellees.

Before FRIENDLY, Chief Judge, and MOORE and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

This appeal from the denial of a New York state prisoner's application for habeas corpus by the District Court for the Western District of New York raises the issue whether an appeallate court, having determined that highly material evidence was erroneously received and that relator's conviction for a more serious offense must therefore be reversed, can constitutionally render a judgment of conviction and impose sentence for a lesser offense for which the untainted evidence would have sufficed. Relator contends that the procedure which New York has here followed has denied him due process of law by depriving him of a trial with respect to the crime for which he was convicted and also of his right to be heard, and to be represented by counsel, with respect to sentence thereon.

The brother and sister-in-law of Lucille Graham, wife of the relator Burton Graham, found her dead, floating face down in the bathtub of her home in Elmira, N. Y., around 12:30 P.M. on August 26, 1961. The Grahams' marital history had been stormy. This was due, on the husband's version, primarily to her cruel treatment of her child by a prior marriage and the three children born to her and Burton, to all of whom he was exceptionally devoted and whose care he had undertaken in an unusual degree. In February, 1961, Lucille sought a separation. The judge asked Burton to leave the home in order to give the Probation Department and the Child and Family Service an opportunity to work on the case.[1] He did this, with a limited visiting schedule. In May he filed a complaint with the Probation Department, asserting that Lucille was an unfit mother. In mid-August she was hospitalized for four days; Burton moved back and cared for the three children.

Within a short time after the discovery of Lucille's body, Burton was questioned by Detective Connelly and others at the office of the district attorney for Chemung County. About an hour and a half later he made a statement in question and answer form: He had left his room about 3:15 A.M. and walked over to his wife's house. After entering through a kitchen window, he had gone upstairs and attempted to persuade her to put the children temporarily in a foster home. She flew into a rage and dug her fingernails into his face.[2] In order to protect himself, he cut off her breath by holding his hand over her mouth and nose. When she quit struggling, he carried her into the bathroom, placed her in the tub, turned the cold water on,[3] and left. He "didn't realize that she was unconscious enough but what she would be able to get out." He denied knowing she was already dead or would drown.

After he had given the statement, Burton was placed under arrest. That evening he was arraigned on a charge of murder in the second degree. The judge advised him that he had a right to an attorney and to a stay of proceedings for a reasonable time in which to secure one.

Six days later, on September 1, Detective Connelly, the assistant district attorney and the chief deputy questioned Graham at the county jail. No attorney for him was present. Connelly asked Graham if he had a lawyer, to which the reply was negative,[4] but did not advise that he was not required to answer without having consulted one. Graham signed and swore to a statement typed by Connelly. This was substantially more damaging than his first statement. He revealed that on earlier visits in August he had typed out two notes, which the police had found in the house, and had typed his wife's name to them. In

---

1. Lucille's son by her previous marriage had already been placed in another home.

2. It seems undisputed that there were marks on Burton's face. There were other marks on his body which he claimed his wife had inflicted after the struggle began.

3. Graham claimed there was already water in the tub. The police found a bath towel and a white rubber glove under Lucille's head.

4. Counsel was not assigned until September 12.

one of these, addressed to the Police, she admitted to having told various lies, abused the children, had extra-marital affairs, and attempted suicide; she announced she was "going away." In the other, addressed to "Burt," she praised his conduct and admitted frequent illicit sexual acts, the latest in some detail; she indicated she was "leaving" and asked Burt not to place the children in a foster home. Graham said he had left these notes at the foot of the steps as he went up to Lucille's room on the night of August 26. Even more important, he admitted that, after he had placed Lucille in the bathtub, she was still struggling and screaming; that he placed his hand "over her mouth and nose for a couple of minutes"; that she then went limp; and that he left the room "knowing she was dying or going to drown." He concluded that his statement of August 26 "was not an honest or true statement." Thereafter Graham was indicted for murder in the first degree.

At the trial, held in 1962, both statements and the notes were received in evidence. Graham testified substantially in accordance with his August 26 statement, although elaborating further on Lucille's cruelty toward the children and his own devotion to them. The prosecution's medical testimony was that Lucille's death was caused by asphyxiation due to drowning. The defense medical expert agreed that the death was due to asphyxiation but testified that it was impossible to determine the cause and that Lucille might have died from pulmonary edema due to natural causes.

The jury found Graham guilty of murder in the second degree.

Before decision of Graham's appeal by the Appellate Division for the Third Department, People v. Graham, 20 A.D.2d 949, 249 N.Y.S.2d 97 (1964), the New York Court of Appeals had ruled in People v. Meyer, 11 N.Y.2d 162, 227 N.Y.S. 2d 427 (1962), that "any statement made by an accused after arraignment not in the presence of counsel . . . is inadmissible." *Id.* at 165, 227 N.Y.S.2d at 428. The Appellate Division concluded on this basis that the statement of September 1 and the two notes were inadmissible; [5] that their admission gave rise to substantial prejudice; and that the absence of objection or exception, save as to the notes, "does not vitiate our right, nor relieve us of . . . our clear duty to reverse for injustice so manifest and so substantial," citing former N.Y.Code Crim. Proc. § 527, 20 A.D.2d at 949, 249 N.Y. S.2d at 99. After referring to § 543 of the former Code of Criminal Procedure,[6] the court concluded that the evidence apart from the post-arraignment statement and the notes was insufficient to sustain a conviction of murder in either degree, and "we are therefore constrained to exercise our power to modify the judgment." *Id.* It did this by deleting the portion sentencing Graham for murder in the second degree and "so as to convict him of the crime of manslaughter in the first degree. . . ." *Id.* For this he was sentenced to a term of not less than 10 nor more than 20 years, the maximum per-

---

5. While we have no occasion to pass on the ruling about the inadmissibility of the notes as a matter of state law, we would not wish to be understood as holding that, from the standpoint of the Federal Constitution, the inadmissibility of the September 1 statement would preclude proof of fabrication of the notes, which the police had found after the August 26 but before the September 1 statement, if that could be done by other means, such as expert testimony about the typewriting.

6. The pertinent portion of this is
   2. Upon an appeal from a judgment of conviction of a felony where, in its opinion, the record does not sustain the judgment with respect to the degree of the crime found but does warrant a judgment of conviction of a lesser degree of such crime, or of a misdemeanor, the appellate court may modify and correct the judgment in accordance with its opinion, in whole or in part, and affirm the judgment as so modified and corrected.

mitted by law.[7] Graham, acting *pro se*, sought leave to appeal to the Court of Appeals; this was denied on July 22, 1964.

On November 5, 1964, Graham filed a *pro se* petition for habeas corpus in the District Court for the Western District of New York. He alleged that the action of the Appellate Division had resulted in his conviction without a trial; that when an appellate court finds a conviction to have resulted from improperly admitted evidence, a new trial is required; that the August 26 statement also was illegally obtained; and that he was tried and sentenced without counsel. The record shows no return by the State pursuant to 28 U.S.C. § 2243; in accordance with what we understand to be the general practice in upstate New York, the district attorney for Chemung County merely presented the record of the state proceedings.

Early in 1965 Graham brought a state *coram nobis* proceeding addressed to the voluntariness of his August 26 statement, and obtained a hearing pursuant to People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). Having "serious doubts" about the voluntariness of the statement, the judge who had presided at the trial held its admission to have been error and set aside the conviction; at this time, October 22, 1965, Graham was released on bail. The Appellate Division reversed with an opinion, 27 A.D.2d 203, 277 N. Y.S.2d 943 (1967), and the Court of Appeals affirmed the Appellate Division without one, 27 N.Y.2d 616, 313 N.Y.S. 2d 753, 261 N.E.2d 661 (1970). Bail was then revoked and Graham was remanded. In February 1971, the district court refused to issue the writ; we granted a certificate of probable cause.

We are met at the outset by the State's contention, apparently advanced for the first time in this court, that Graham has failed to exhaust available state remedies with respect to the 1964 action of the Appellate Division; it argues that Judge Burke's finding, "The petitioner has exhausted available state remedies," must be read as limited to the August 26 statement. It suggests that Graham should now move under § 440.10, subd. 1(h) of the Criminal Procedure Law, McKinney's Consol.Laws c. 11–A, before the trial court to vacate the judgment entered on remittitur from the Appellate Division in 1964. While it recognizes that the trial court would feel bound to deny the motion because of the Appellate Division's mandate, it proposes that Graham then move for leave to appeal to the Appellate Division under N.Y. Criminal Procedure Law, § 450.15(1). If such leave were denied, apparently that would be the end of the road within the state system, Criminal Procedure Law § 450.90.

We are not disposed to send Graham back to the state courts for further proceedings when the State has sat by for seven years after the filing of this petition without making any suggestion that this is required.[8] To do so "might well invite the reproach that it is the prisoner rather than the state remedy that is being exhausted." U. S. ex rel. Kling v. LaVallee, 306 F.2d 199, 203 (2 Cir. 1962) (concurring opinion). Although Graham's *pro se* motion for leave to appeal from the Appellate Division cannot now be found, there is every reason to think it raised substantially the same points presented in his well-

---

7. One justice dissented. Believing the legally admitted evidence sufficient to support a conviction for murder in the second degree, he would have reversed for a new trial.

8. If the suggestion had been earlier made, Graham would doubtless have raised the point in his 1965 state *coram nobis* proceeding. In fact, the transcript of that proceeding indicates that petitioner therein sought review of more than the single issue decided. Just what additional issues were raised is unclear. The judge ruled that "You can have an exception that all other matters were determined or should have been determined upon the appeal and all I will determine today is the question of the voluntariness of the [August 26] statement."

written habeas petition a few months later. Graham was surely not seeking leave to appeal from the reversal of his second degree murder conviction; the conviction for first degree manslaughter and the imposition of sentence thereon must almost certainly have been the subject of his motion for leave to appeal. At least the inference of this is sufficiently strong to transfer to the State the burden of coming forward with evidence to negate it. If Graham adequately raised his constitutional objections on these points in his motion for leave to appeal to the New York Court of Appeals, he was not required to seek post-conviction relief on the same grounds, at least where, as here, no further development of the facts beyond the record before the appellate court was needed for proper resolution of these constitutional claims. Brown v. Allen, 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Roberts v. LaVallee, 389 U.S. 40, 42–43, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); Thompson v. Peyton, 406 F.2d 473, 474–475 (4 Cir. 1968); Tyler v. Swenson, 440 F.2d 621, 623 (8 Cir. 1971). In any event, the exhaustion requirement of 28 U.S.C. § 2254 is not jurisdictional and courts may deviate from it in those rare instances where justice so requires. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L. Ed. 761 (1950). See, e. g., Thomas v. Cunningham, 335 F.2d 67, 69–70 (4 Cir. 1964); Brown v. Fogel, 387 F.2d 692 (4 Cir. 1967); Jenkins v. Fitzberger, 440 F.2d 1188, 1189 n. 2 (4 Cir. 1971). Here the probability that Graham raised the issue in his motion for leave to appeal or in his *coram nobis* proceeding, see note 8, or in both, is so great that we must deal with his complaint on the merits.

█ We think the Appellate Division, by what doubtless was inadvertent error, wrongly assimilated a case where evidence supporting a conviction of a more serious offense had been unlawfully received to one where the evidence was merely insufficient for that purpose. In the latter event, the trier of the facts has already found every element of a lesser included offense on evidence which was properly before it. In such a case there is no unfairness in the appellate court's modifying the judgment to apply only to the lesser offense, of which the jury could properly have convicted and surely would have,[9] although it may well be that, even in such a case, the defendant is constitutionally entitled to a new sentencing on the lesser crime at which he will have the assistance of counsel. See Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), held fully retroactive in McConnell v. Rhay, 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968).[10] In contrast, here it is sheer speculation what the jury would have done if the September 1 confession and the admittedly fabricated notes had not been before it. To be sure, the August 26 statement and the medical and other evidence would have been sufficient to sustain a conviction for first degree manslaughter, or even perhaps for second degree murder as the judge dissenting in the Appellate Division thought, see note 7, *supra*, whether or not Graham had taken the stand. But without the material held to have been erroneously received, there would have been a sharp issue of credibility whether Graham had merely done what he deemed necessary to quiet Lucille and

9. See Ritchie v. State, 243 Ind. 614, 189 N.E.2d 575, 579 (1963); State v. Sorrentino, 31 Wyo. 129, 224 P. 420 (1924).

10. The possible importance of this is illustrated by the facts of this case. The trial judge, who had said that "life has dealt very unkindly" with Graham and praised the latter's previous life history and affection towards his children, announced he was giving "the absolute minimum punishment" for second degree murder that he could. Presentation by counsel on a resentence for first degree manslaughter might well have led the judge to impose something less than the maximum sentence, which the Appellate Division did.

had left believing that she was alive and the cold water would shortly revive her, or whether he had caused her death "in the heat of passion, but in a cruel and unusual manner." Former N.Y. Penal Law § 1050(2), McKinney's Consol.Laws c. 40. It is not a sufficient answer that the justices of the Appellate Division may well have been justified in thinking that the latter conclusion would have been the more reasonable or even that the former would have been unreasonable. A jury hearing solely the evidence held to have been legally admissible might well have found Graham guilty of only second degree manslaughter, former New York Penal Law § 1052, if indeed it did not exercise its "power to bring in a verdict [of acquittal] in the teeth of both law and facts." See Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920). The trial judge surely would not and, of course, could not have directed a verdict of guilty of first degree manslaughter or of any other crime. See, e. g., People v. Walker, 198 N.Y. 329, 334, 91 N.E. 806 (1910); People v. Upton, 38 Hun. 107 (1885). Yet what the Appellate Division did here is the equivalent in practical effect—indeed worse from the defendant's standpoint in several ways. The judges had not heard or seen the witnesses; they had read the inadmissible material; and Graham was afforded no opportunity to be heard, with the assistance of counsel, on the sentence for the crime of which he was convicted.

The State argues that this analysis assumes Graham had a federal constitutional right to a jury trial on a charge of first degree manslaughter whereas the applicability of the jury trial requirements to the states was not recognized until Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), a decision held not to be retroactive in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968). There are several answers to this. The issue in Duncan was whether the Fourteenth Amendment required the states to afford a jury trial in all criminal cases—in that instance simple battery—save for "petty offenses." The question whether the Fourteenth Amendment does not require opportunity for a jury trial on a charge of homicide carrying a maximum penalty of twenty years imprisonment is an entirely different one. It seems never to have arisen, because "the laws of every State guarantee a right to jury trial in serious criminal cases," 391 U.S. at 154, see also 149–150 n. 14, 88 S.Ct. at 1450. Cf. 3 Blackstone, Commentaries 379 (1829). If any state did not accord a right of jury trial on a charge carrying so heavy a penalty as first degree manslaughter, New York has not called our attention to it. To apply Duncan retroactively in such cases would thus have none of the harmful effects that led to the general holding of prospectivity in DeStefano v. Woods.

■ A second answer is that in criminal cases Chief Justice Hughes' much cited statement, "The one who decides must hear," Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288 (1936), applies in full force, without the qualifications that have been recognized for certain civil and administrative proceedings. Cf. Utica Mutual Ins. Co. v. Vincent, 375 F.2d 129 (2 Cir.), cert. denied, 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967). Cases emphasizing the importance of demeanor as an aid to the determination of credibility are too numerous and well-known to require extended citation; Judge L. Hand's famous statement in Dyer v. MacDougall, 201 F.2d 265, 268–269 (2 Cir. 1952), will suffice. Due process forbids that, when an issue of fact is presented, a man should be sent to prison without the trier of the facts having seen and heard his accusers and himself, if he desires to testify, and weighing their credibility in the light of their demeanor on the stand. We would thus reach no different conclusion in this case if Graham had not been constitutionally entitled to a jury trial. It would still be for the judge who saw and heard the witnesses at the trial or, bet-

ter, another judge who would see and hear them without having been exposed to the illegal evidence, to determine where the truth lay—not for appellate judges reading a cold record. If more were necessary, we would add that, as indicated by the preceding sentence, the justices of the Appellate Division who decided Graham's appeal, able and fair-minded as we know them to be, could not have escaped unwitting prejudice against him from their reading of the September 1 statement and the admittedly fabricated notes. We know how impossible it would be for us to assess the credibility of Graham's trial testimony without being affected by the evidence held to have been improperly admitted. See Bruton v. United States, 391 U.S. 123, 129–131 & n. 4, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). With the greatest respect, we do not believe the justices of the Appellate Division have a greater supply of insulating material. Compare A. L. Levin and H. K. Cohen, The Exclusionary Rules in Nonjury Criminal Cases, 119 U.Pa.L.Rev. 905, 917–25 (1971).

■ We hold therefore that once the Appellate Division determined that the jury should not have been exposed to the September 1 statement and the notes, due process required a new trial. While we do not believe this conclusion hinges on whether the court's ruling with respect to the inadmissibility of that evidence was compelled by the Federal Constitution, we think that, save possibly for the lack of objection below, which the court considered it was required to overlook, in fact the ruling was so compelled. People v. Meyer, *supra*, was a harbinger of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, decided May 18, 1964. Although the Supreme Court has not yet determined whether *Massiah* applies when a

conviction that had become final before May 18, 1964, is subjected to collateral attack,[11] the decision does apply to trials held before that date when the direct appellate process was not completed until later. McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965). Here that process did not end until July 22, 1964, when leave to appeal to the New York Court of Appeals was denied.

■ Graham asks us not merely to order that he be released unless he is given a new trial but to direct that the People may not introduce his August 26 statement at such a trial since, as Graham contends, this was involuntary. While we might simply postpone that issue, the interests of judicial economy would be ill served by allowing the prosecution to introduce the statement if we were certain that any resulting conviction would be constitutionally defective. On what is now before us we do not think it would be.

The argument for the involuntariness of the statement is mainly this: Early in his interview on the day of Lucille's death, Graham had asked about the children, then aged 7, 4 and 2½, and manifested his concern for and devotion to them. For some time he insisted that he had not left his rooming house or gone to his wife's home during the night. Detective Connelly had reason to doubt the veracity of this since Graham's children had reported earlier that morning that they had seen their father at the house during the night. When Graham persisted in his denial of having been present at the house, Connelly responded, "I don't want to bring the children into this, but I will if I have to."

■ The attempt to analogize this to Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), fails. There the police threatened Mrs. Lyn-

11. This court has held it does not. United States ex rel. Romano v. Fay, 360 F.2d 389 (2 Cir. 1966), cert. denied sub nom. Romano v. Follette, 385 U.S. 1020, 87 S.Ct. 725, 17 L.Ed.2d 557 (1967). The issue is now pending before the Supreme Court in Milton v. Wainwright, 428 F.2d 463 (5 Cir. 1970), cert. granted, 403 U.S. 904, 91 S.Ct. 2209, 29 L.Ed.2d 679 (1971). Compare Arsenault v. Massachusetts, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968).

umn with loss of the custody of her children unless she confessed. Here there was no threat that unless he confessed, Graham would not be allowed to see the children, cf. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), or that any harm would come to them. All that Detective Connelly did was to make known to Graham that if he persisted in what the detective reasonably considered a false denial, he would be confronted with one or more of the children. While this prospect was surely repugnant, the Constitution does not require the police to avoid all unpleasantness to suspects in the investigation of crime—especially of one so serious as homicide. It is immaterial whether the People could have called any of the children at a trial, see former N.Y.Code of Crim.Proc. § 392. The case was in an early investigative stage, Graham was not yet under arrest, and if in fact he had not been at the house, it was the police's job to ascertain who had been.[12] We agree with the Appellate Division and with the district court that the People here sustained the burden of showing that the August 26 statement was not involuntary. In doing so, we apply the "preponderance of the evidence" standard, all that the Federal Constitution requires. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).[13] We thus hold that, on the present record, there is no basis for our precluding use of the August 26 statement at a new trial. The state trial court is, of course, free to reexamine the issue if it should deem this appropriate and permissible.

The order is reversed, with directions to issue the writ unless Graham is retried within sixty days from the issuance of our mandate or such further reasonable time as the district court, for good cause shown, may allow.

---

12. Two police officers, called by a neighbor who had heard Lucille scream during the night, had heard a baby crying, a woman sobbing, and a man's voice saying "shut up."

13. The trial judge, following the teaching of People v. Huntley, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 843, 204 N.E.2d 179, 183 (1965), applied a "voluntariness beyond a reasonable doubt" standard. Although the Appellate Division's opinion is not explicit on this point, it no doubt applied the same standard in light of the Huntley decision. The district court likewise concluded, on the basis of the record of all prior proceedings, that the statement "was proven beyond a reasonable doubt to have been voluntarily given." Necessarily, both the Appellate Division and the district court found the statement voluntary by a preponderance of the evidence.

The New York Court of Appeals did not make clear whether the standard for admissibility established by *Huntley* was thought to be required by the Federal Constitution or was imposed simply as a matter of state law. It will now be for the New York courts to decide whether to continue to follow the more stringent *Huntley* standard or only that required by the recent decision in Lego v. Twomey, *supra*. Whatever they decide, federal courts in collateral attacks on state court convictions may only apply the preponderance of evidence standard.