**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Herman RADDATZ,
Defendant-Appellant.**

**No. 78–1350.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1978.

Decided Feb. 6, 1979.

Rehearing and Rehearing En Banc
Denied May 4, 1979.

Joan B. Gottschall, Chicago, Ill., for defendant-appellant.

Leida A. Schoggen, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, SPRECHER, and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

The district court found the defendant, Herman Raddatz, guilt of violating 18 U.S.C. § 922(h), receipt of a firearm in interstate commerce by a convicted felon, and imposed a five year sentence.[1] The Government concedes on appeal that the sentence imposed was improper under our decision in *United States v. Batchelder,* 581 F.2d 626 (7th Cir. 1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 830, 59 L.Ed.2d 30 (1979).[2]

The defendant argues additionally, however, that the reference of his motion to suppress evidence to a magistrate under 28 U.S.C. § 636(b)(1)(B) violated both the Due Process Clause and Article III of the Constitution. We conclude that the defendant was denied Due Process and accordingly reverse and remand for a new hearing on the motion to suppress before the district court.

I

On August 8, 1976, two Chicago police officers, Monroe Vollick and James Bach, arrested the defendant for unlawful use of a weapon. Officer Vollick testified at trial that just prior to his arrest, the defendant was found standing over a man with a bleeding head injury. The defendant was holding a gun. The bleeding man, Jimmy Batson, told the officers that he had fallen down. Officer Vollick testified that while in custody, Raddatz told the police that he had been fighting with Batson over a family matter. The officer further testified that Raddatz stated he had brought the gun with him in case any of Batson's friends were around. A formal state charge was filed against the defendant on October 27, 1976.

1. Ultimately the judge modified the sentence to require only six months incarceration, but to be followed by 4½ years probation.

2. Although 18 U.S.C. § 924 authorizes a maximum sentence of five years for violations of § 922(h), another section of the criminal code describes the same offense but authorizes a maximum sentence of only two years. In *Batchelder* we held that, "[i]t is impermissible to sentence a defendant for five years under Section 922(h) when he could receive only a two year maximum sentence under Section 1202(a)." 581 F.2d at 629.

Paul Russell and Richard McCulloch, Special Agents for the Bureau of Alcohol, Tobacco and Firearms learned from Officer Vollick that a state firearm charge was pending against the defendant. The agents were also aware that Raddatz was a convicted felon, and that the gun had traveled in interstate commerce (two of the elements necessary for the prosecution in issue).

On November 19, 1976, McCulloch and Russell interviewed Raddatz at his home. After reading *Miranda* warnings to him, Russell told Raddatz that the gun which was recovered from the defendant's possession on August 8 had been traced to its last owner, a victim of an unsolved homicide in another state. The defendant told the agents that he had taken the gun from Batson to pistol-whip him and did not know where Batson had acquired the gun.

On January 12, 1977, the defendant called the firearms agents and requested a meeting. The agents picked Raddatz up and brought him to their office. The defendant there informed the agents that his earlier statement of November 19 was incorrect. He told the agents that he had not taken the gun from Batson and related to them how he had acquired it.

The state charges were dismissed on February 22, 1977. A federal indictment under 18 U.S.C. § 922(h) followed on March 1, 1977. Pretrial motions, including a motion to suppress various statements made by the defendant, were filed on May 4, 1977. Over the defendant's objection, the district court judge referred the motion to suppress to a magistrate for hearing.

At the hearing before the magistrate, defense counsel attempted to demonstrate that the January 12, 1977 statement of the defendant was involuntary because it was made in reliance on promises of the agents that the case against him would be dismissed if he cooperated.[3] If the agents had promised a dismissal of the indictment in

exchange for information about the origins of the gun the statement would in all likelihood be suppressed. *See Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964) (citing the statement of *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897) that the "constitutional inquiry is . . . whether the confession was 'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .' "). The January 12 statement was relied upon by the Government to establish two of the essential elements of the offense, thus underscoring the dispositive character of the motion.

The defense elicited two varieties of evidence to support a finding of inducement: testimony of the promise and of a course of conduct suggestive of a prior promise. The defendant testified that at the November 19 meeting Russell told him that he was going to be indicted by federal prosecutors. If the defendant would cooperate with the agents, however, "somebody would talk to the prosecutor, and it would be dismissed." The defendant further testified that he was advised that otherwise he would be given a lengthy sentence in a federal penitentiary. The defendant stated that his meeting with the agents on January 12 was motivated solely by his decision to take advantage of the agents' offer. He testified that before he gave the corrected statement on January 12, the agents assured him that their offer of November 19 was still good.

The defense also introduced testimony to establish a course of cooperation with the agents to support the inference of a promise. First, it is uncontested that the defendant's January 12 trip to see the agents was unsolicited. On that date he gave them all the information he had about the

---

**3.** The defendant also challenges the admissibility of the statements on alternative grounds. Defendant argues that the waiver of the privilege against self-incrimination is not valid because the agents' version of the events suggests that they intentionally misled the defendant to

believe that he was not in jeopardy of prosecution. Defendant also argues that the statements are excludable because his right to counsel was violated at two of the interviews. In view of our ultimate disposition, we need not consider these claims.

gun he had used on August 8, implicating his half-brother and another individual in gun-dealing activities. The agents gave him $10 on that date to enable him to locate the people from whom he had obtained the gun. On January 14, the defendant brought his wife with him to the agents' office to discuss again activity as an informant. McCulloch gave him $50 at that meeting. On a later date, the defendant took McCulloch to an area of the city where he claimed guns were being sold illegally. He also turned over some additional names of possible firearms violators. The defendant, however, never set up a gun sale for the agents.

The defendant claims that this course of conduct circumstantially supports his testimony that a promise had been made on November 19, 1976. He argues that it is not credible to believe that he just casually volunteered this self-incriminating information. Further, he argues that the agents immediately treated him as an informer when he contacted them because that was in accord with the prior agreement they had made.

Although the agents are essentially in agreement with this account of the conduct which transpired, they deny any November 19 promise to obtain dismissal of anticipated charges in exchange for cooperation. Agent Russell supported this contention by stating that as of the November 19 meeting Raddatz was not even an object of investigation. The purpose of the November 19 meeting was to obtain information about the prior ownership of the gun confiscated from Raddatz on August 8, since that gun had been used in an unsolved homicide. Russell stated that he had met Raddatz on only two occasions, November 19 and January 12. At one point in the hearing he denied that he discussed any possibility of cooperation with the defendant on either date. On cross-examination however, Russell stated that he told the defendant on November 19 that if Raddatz would cooperate in locating Batson, Russell would mention the defendant's cooperation to the United States Attorney in the event a case was brought against him. Russell stated

that the request for cooperation was limited to assistance in tracing the ownership of the gun and that Raddatz had not been recruited to act as an informant.

McCulloch also testified that no promise was made to Raddatz on November 19. However, McCulloch's testimony varies from Russell's in several respects. First, McCulloch testified that the purpose of their November 19 visit was to obtain the venue information which they needed to initiate a prosecution against Raddatz. He also specifically testified that the agents sought Raddatz's cooperation as an informant at the January 12 meeting and suggested that Raddatz had been told on November 19 that favorable mention would be made to the United States Attorney if he cooperated. Although the agents concede that Raddatz cooperated by giving them information about the gun used on August 8, no mention of this cooperation was made to the United States Attorney. McCulloch explained that the agents did not speak to the United States Attorney on the defendant's behalf because he never gave the type of cooperation they requested—arranging a gun sale.

On the basis of this testimony, the magistrate recommended that the motion to suppress be denied. He specifically stated, "I find the testimony of the Alcohol, Tobacco and Firearms agents more credible . . . I find that Federal agents never advised Raddatz that charges against him would be dismissed, if he cooperated." The defendant filed objections to the magistrate's recommendation with the district court. After reading the transcript of the motion to suppress and hearing arguments by both parties the district court overruled the objections and adopted the recommendation of the magistrate. The judge did not hear testimony from the witnesses who appeared at the suppression hearing before the magistrate.

## II

The defendant's principal contention on appeal is that his conviction was improper

because his motion to suppress was heard before a magistrate and not before the trial court judge. In 1976, Congress amended the United States Magistrates Act to clarify that motions to suppress, as well as a variety of other motions, could be referred to magistrates for a hearing. 28 U.S.C. § 636(b)(1). The amendment was enacted to overrule the Supreme Court construction in *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), of Congressional intent as precluding magistrates from hearing motions to suppress.

The defendant argues that despite the clear statutory authorization, the reference in this case was improper on several grounds. The primary contention is that the reference was made in a manner which violated both Article III and the Due Process Clause of the Constitution. In addition, the defendant argues that the reference was invalid because not made pursuant to required enabling rules. The defendant finally suggests that it would be appropriate for this court to exercise its supervisory powers to prohibit the procedure employed in this case. Since it is well established that it is preferable to avoid constitutional adjudication we address the non-constitutional arguments of the parties first.

 Section 636(b)(4) of the Act requires that "[e]ach district court shall establish rules pursuant to which the magistrates shall discharge their duties." The defendant argues that the district court did not have the power to refer the hearing on the motion to suppress to a magistrate, because no rule of the district court explicitly provided for this category of reference. He reasons that an explicit rule is required by the statute and that the district court's failure to enact such a rule rendered the reference *void ab initio,* necessitating a new hearing pursuant to valid rules. The local rules enacted in 1975 provide that magistrates are

> authorized to exercise all powers and perform all duties now or hereafter authorized by the Constitution and laws of the U.S., applicable Federal Rules of Civil and Criminal Procedure, local rule, order or regulation.

Loc.Mag.R. 1.01A. The rules further provide:

> Without limiting the general grant of authority in paragraph 1.01A, the U.S. Magistrates in this district are authorized to perform the following duties in criminal cases:

> . . . . .

> Upon reference by a judge of this court, assist the judge in the conduct of pretrial proceedings including, but not limited to, hearing and ruling upon all discovery motions pursuant to Rule 16 of the Federal Rules of Criminal Procedure and conducting pretrial conferences pursuant to Rule 17.1 of the Federal Rules of Criminal Procedure.

Loc.Mag.R. 1.01B(8). We are not convinced that the rules are so devoid of content as to deprive the lower court of any power to make this reference under the statute. Congress mandated that the district court establish rules. Rules have been established, and those rules can be construed to authorize the reference of a motion to suppress—a "pretrial proceeding"—to a magistrate. Although in some cases the defendant might properly challenge the sufficiency of the rules, this is not such a case. The defendant does not allege any deficiency in the magistrate's discharge of his duties—the subject of the required rules. Thus he cannot establish any prejudice from the failure of the district court to enact more precise standards. The statutory mandate to enact rules was satisfied.

 It is also not possible to avoid the constitutional questions presented by resort to our supervisory powers. The defendant requests that this court exercise its supervisory powers to prevent the procedure employed in this case either by prohibiting referral of motions to suppress to magistrates or by requiring the trial judge to rehear the contested evidence presented to the magistrate. Both of these solutions are unavailable. The appellate courts must be ever wary that it is only appropriate to "supervise" when Congress has not. As the Supreme Court stated in *United States v.*

*National City Lines, Inc.,* 334 U.S. 573, 589, 68 S.Ct. 1169, 1178, 92 L.Ed. 1584 (1948), "Our general power to supervise the administration of justice in the federal courts . . . does not extend to disregarding a validly enacted and applicable statute or permitting departure from it . . . ." *See also Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); Comment, *Judicially Required Rulemaking as Fourth Amendment Policy: An Applied Analysis of the Supervisory Powers of Federal Courts,* 72 Nw.U.L.Rev. 595, 622 (1977). In *National City Lines,* the Court instructed that before exercising supervisory power, the court must examine the purpose of relevant statutes to ascertain whether "room was left for judicial discretion" to impose extra-constitutional requirements. 334 U.S. at 588, 68 S.Ct. at 1177.

■ The Magistrates Act and its history clarify that this court cannot use the supervisory power to prevent the reference of a motion to suppress to a magistrate or to require the district court judge to personally hear the evidence on a motion that has been referred to a magistrate. The statute is explicit on both issues. Section 636(b)(1) provides:

> (b)(1) *Notwithstanding any provision of law to the contrary—*

> (A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. . .

> (B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court,

of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

> (C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge *may* also receive further evidence or recommit the matter to the magistrate with instructions.

(Emphasis added). The House Report accompanying the bill states that although the judge must make a "de novo determination" this "is not intended to require the judge to actually conduct a new hearing on contested issues." *H.Rep.No.*94–1609, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6162, 6163.

The legislative history underscores that this use of the supervisory power would be inconsistent with the purposes of the amendments. Expressly relying on the House Committee on the Judiciary's own responsibility for the "oversight of the federal courts," Congress designed the statute to enable the district court judges, through increased use of magistrates, to "have more time to preside at the trial of cases having been relieved of part of his duties which required the judge to personally hear each and every pretrial motion or proceeding necessary to prepare a case for trial." *Id.* at 6166. *See also id.* at 6173. Although Congress did not prohibit the district court from rehearing evidence presented to the

magistrate, the statute invests the *district court judge* with discretion to make that procedural decision. *Id.* at 6162–63. The appellate court can now only review, and not divest, the lower court of that discretion. As in *National City Lines,* we must conclude that the Congressional purpose to broaden the procedural choices of a district judge cannot be "narrowed again by application of the vague and discretionary power." 334 U.S. at 581, 68 S.Ct. at 1174.

### III

The constitutional questions are dispositive of this appeal. The defendant rests his challenge to the procedure employed in this case on both Article III and Due Process. Although our construction of the statute satisfies Article III, we conclude that defendant's Due Process rights were violated.

■ Article III requires that the judicial power of the United States be vested in Article III judges. The defendant argues that the Magistrates Act, when applied to allow the reference of a hearing on contested facts, unconstitutionally delegates judicial power to a non-Article III judge. Anticipating potential Article III objections to an expanded role for federal magistrates, Congress resolved to avoid any such objections by requiring that a district court judge "shall make a de novo determination" on contested aspects of a magistrate's recommendation in case-dispositive motions. 28 U.S.C. § 636(b)(1)(C). *See Sick v. City of Buffalo,* 574 F.2d 689, 693 n.17 (2d Cir. 1978). The Supreme Court in *Mathews v. Weber,* 423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976), emphasized that the statute clearly requires the Article III judge to make a de novo determination. Article III is therefore satisfied. *Sick v. City of Buffalo,* 574 F.2d at 693; *Noorlander v. Ciccone,* 489 F.2d 642, 648 (8th Cir. 1973).

■ The trial judge in this case exercised his discretion to make the de novo determination on the basis of the written record without hearing the witnesses' testimony. Although the statute does not mandate the judge to rehear the testimonial evidence, the Due Process Clause of the Constitution does. We conclude that the procedure employed in this case denied defendant his Due Process right to a meaningful hearing before the trier of fact on his motion to suppress.[4]

■ There is no question that Due Process guarantees a meaningful hearing and procedures sufficient to ensure a reliable determination of the facts underlying a motion to suppress. *Jackson v. Denno,* 378 U.S. 368, 376–77, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), *United States v. Bergera,* 512 F.2d 391, 393 (9th Cir. 1975). Due Process, however, does not encompass any fixed requirement that the trier of fact personally hear the evidence in every case. Courts have on occasion upheld the constitutionality of decisions rendered by a trier of fact who decided the case on the basis of a transcript. *Utica Mutual Insurance Co. v. Vincent,* 375 F.2d 129 (2d Cir.), *cert. denied,* 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967); *Van Teslaar v. Bender,* 365 F.Supp. 1007 (D.Md.1973). The command of Due Process is only that the defendant be given a "hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The precise question then is whether the nature of this case necessitates that the trier of fact personally hear the evidence in order to ensure a meaningful determination of the facts. We conclude that it does.

■ Several aspects of the "nature of this case" demonstrate why the trier of fact

---

**4.** Although we conclude that the procedures employed were insufficient to ensure an accurate de novo determination, we cannot conclude from this record that the judge simply abused his discretion under the statute by not making the required de novo determination. Similarly, although courts have suggested that Article III is only satisfied when the trial court retains and *exercises* de novo decision making power, *see Noorlander v. Ciccone,* 489 F.2d 642, 648 (8th Cir. 1973), we do not conclude that Article III was violated. The trial court may well have made a de novo judgment, but we simply do not believe that the judgment was derived from constitutionally adequate procedures.

must necessarily have heard the evidence himself to guarantee the substantial rights of the defendant. We emphasize that this is a criminal case,[5] tried in an Article III court.[6] The defendant has not consented to the procedure employed by the judge,[7] and credibility evidence is central to the determination of a material issue of fact.

It is quite clear from the record that in this case credibility is determinative, as in many motions to suppress. *See Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Davis v. North Carolina,* 384 U.S. 737, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The success or failure of the motion to suppress—and in effect the prosecution itself—depends upon whether the judge believes or disbelieves the defendant's statement that the law enforcement officers promised him that a federal charge against him would be dropped if he cooperated. This is perhaps the most significant factor in determining what fact-finding procedures must be employed.

The nature of the evidence necessary for decision inevitably must affect the type of procedures required to evaluate the evidence. It has been emphasized for decades that judicial fact-finding must be designed to foster a reliable determination of credibility. *Wingo v. Wedding,* 418 U.S. 461, 474, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Holiday v. Johnston,* 313 U.S. 342, 352, 61 S.Ct. 1015, 85 L.Ed. 1392 (1941). The courts have generally recognized only two procedures as adequate to the task. Of course the most common method of determining credibility is to require the trier of fact to observe the demeanor of the witnesses. Alternatively, when the ultimate trier of fact has not seen and heard the witnesses, credibility is accounted for by requiring the trier of fact to afford substantial deference to the factual determination of the judge or examiner who did hear the witnesses. *See, e. g.,* the doctrine requiring appellate courts to defer to trial court findings of fact unless "clearly erroneous." Fed.R.Civ.P. 52(a); *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Aunt Mid, Inc. v. Fjell-Oranje Lines,* 458 F.2d 712, 716 (7th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972); *S. Buchsbaum & Co. v. Federal Trade Commission,* 153 F.2d 85, 88 (7th Cir.), *vacated on request of parties,* 328 U.S. 818, 66 S.Ct. 1016, 90 L.Ed. 1600 (1946). *See also* Fed.R.Civ.P. 53(e)(2), requiring the district court to accept a master's findings of fact unless clearly erroneous.

Neither of these procedural devices for assessing credibility was employed in this case. First, the statute itself prohibits any reliance on the latter procedure of according substantial deference to the findings of the individual who heard the evidence. The statute expressly requires the district judge to make a de novo determination of contested issues of fact—a mandate incompatible with the practice of according deference sufficient to ensure that demeanor evidence is adequately weighted. And although the statute would not have prevented reliance on the alternate device—hearing the testimony—the judge exercised his discretion not to hear it and made his determination on the written record alone.

Our reading of the record convinces us of the wisdom of the traditional practice. The record here does not reveal a pattern of facts that exposes the defendant's testimo-

---

5. The nature of the right at stake dictates the degree of procedural precaution due by the judicial system. In criminal cases, the procedural protections must be the greatest. *See, e. g., United States ex rel. Graham v. Mancusi,* 457 F.2d 463 (2d Cir. 1972). Thus whether this procedure may satisfy Due Process in some civil cases is a question we need not decide.

6. *See Rogers v. Loether,* 467 F.2d 1110, 1116 (7th Cir. 1972), *aff'd sub nom. Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260

(1974), suggesting a distinction between procedures required in judicial rather than statutory courts.

7. A number of courts have upheld references to a magistrate when done with the consent of the parties. *Sick v. City of Buffalo,* 574 F.2d 689, 690 n.5 (2d Cir. 1978); *Reciprocal Exchange v. Noland,* 542 F.2d 462, 463 (8th Cir. 1976); *De Costa v. CBS, Inc.,* 520 F.2d 499, 503–08 (1st Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976).

ny as wholly incredible. Thus the truth cannot be derived from this written record without an intolerably high margin of error—a margin of error that time-honored tradition teaches can be substantially reduced by simply requiring the trier of fact to hear and observe the witnesses.

Prior precedents uniformly support our conclusion that the responsibility for the hearing and the decision must be vested in the same judge in a criminal case where credibility is essential. This rule of decision emerges in several classes of cases. Of most direct relevance, the rule has been applied in cases involving references to magistrates. In *Noorlander v. Ciccone,* 489 F.2d 642, 648–49 (8th Cir. 1973), the Eighth Circuit held that although evidentiary hearings in habeas cases could be referred to magistrates under the Act, Due Process required that if a defendant objected to the magistrate's determination of a material fact, "an Article III judge . . . [must] personally take the testimony of the witnesses, determine their credibility and decide for himself what the facts are." *Id.* at 648.[8] The Ninth Circuit, in *United States v. Bergera,* 512 F.2d 391 (9th Cir. 1975), stated that absent deference to the magistrate's recommendation,[9] Due Process requires the judge to hear the testimony and prohibits a decision based solely on the transcript. *Id.* at 394. The same result was reached by the First Circuit in *O'Shea v. United States,* 491 F.2d 774, 778 (1st Cir. 1974) (grounds for decision not stated). *Cf. McKinney v. Parsons,* 488 F.2d 452 (5th Cir. 1974). Although not decided under the United States Magistrates Act, Judge Weinstein found, in a comprehensive opinion, that lawyers were denied Due Process by New York disciplinary proceedings which provided a testimo-nial hearing only before a magistrate, and not before the judge responsible for a de novo determination. *Mildner v. Gulotta,* 405 F.Supp. 182, 201–33 (E.D.N.Y.1975) (dissenting opn.), *aff'd mem.,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). *See also United States v. Vater,* 259 F.2d 667, 674 (2d Cir. 1958) (dissenting opn.) (Lumbard, J.).

This circuit has applied this principle in another line of cases. In *Smith v. Dental Products Co.,* 168 F.2d 516 (7th Cir. 1948), and *S. Buchsbaum & Co. v. Federal Trade Commission,* 153 F.2d 85 (7th Cir.), *vacated on request of parties,* 328 U.S. 818, 66 S.Ct. 1016, 90 L.Ed. 1600 (1946), we held that when a judge who held a hearing dies before ruling, a successor judge may not rely on the transcript of the hearing to render a decision. Due Process requires that the witnesses be heard by the successor judge. The same result has been reached in other circuits on various grounds. *See United States v. Nugent,* 100 F.2d 215, 217 (6th Cir. 1938), *cert. denied,* 306 U.S. 648, 59 S.Ct. 591, 83 L.Ed. 1046 (1939); *Bromberg v. Moul,* 275 F.2d 574 (2d Cir. 1960). *See also* Fed.R.Civ.P. 63; Fed.R.Crim.P. 25; 7 Moore's Federal Practice ¶ 63–05 at 63–9 (2d Ed. 1978).

Finally we rely on Judge Friendly's decision in *United States ex rel. Graham v. Mancusi,* 457 F.2d 463 (2d Cir. 1972). In *Mancusi,* the defendant challenged a New York procedure permitting an appellate court to enter a conviction for a lesser offense when improperly admitted evidence would require reversal of the offense for which the defendant was convicted. The Second Circuit found this procedure constitutionally deficient, reasoning that the ap-

---

**8.** Although a Due Process case, *Noorlander* was actually decided on the Due Process right of the party to have his case heard by an Article III judge. Here we decide only that defendant had a Due Process right to a meaningful hearing.

**9.** The court in *Bergera* suggests that its prior decision in *Campbell v. United States District Court,* 501 F.2d 196 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974), permitting the trial court to *accept* the magis-trate's recommendation without rehearing the evidence, is not inconsistent. 512 F.2d at 392. We are in total accord with the court's conclusion in *Bergera* that Due Process is only satisfied if the trial court defers to the magistrate or rehears the evidence. We do not believe however that the degree of deference suggested by *Bergera* and Due Process is consistent with the statutory requirement of a de novo determination.

pellate court was assuming the role of the decider of fact without benefit of observing the evidence. Judge Friendly stated that:

> Due process forbids that, when an issue of fact is presented, a man should be sent to prison without the trier of the facts having seen and heard his accusers and himself, if he desires to testify, and weighing their credibility in the light of their demeanor on the stand. . . . It . . . [is] for the judge who saw and heard the witnesses at the trial . . to determine where the truth lay—not for appellate judges reading a cold record.

*Id.* at 469–70.

We are aware of no persuasive authority to the contrary. Some decisions in the administrative context have permitted the trier of fact to render a judgment on the basis of a written record. In *Utica Mutual Insurance Co. v. Vincent,* 375 F.2d 129 (2d Cir.), *cert. denied,* 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967), Judge Friendly found that no Supreme Court decision "suggests that the decider must actually hear the witnesses or be furnished a report on their credibility; the thrust is quite the opposite." *Id.* at 132. But in *Mancusi,* Judge Friendly specifically limited his opinion in *Utica Mutual Insurance Co.,* stating:

> [I]n criminal cases Chief Justice Hughes' much cited statement, "The one who decides must hear," *Morgan v. United States,* 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), applies in full force, *without the qualifications* that have been recognized for certain civil and administrative proceedings. *Cf. Utica Mutual Ins. Co. v. Vincent* . . . . .

457 F.2d at 469 (emphasis supplied).

Nor do we believe that any case decided under the Magistrates Act advises a contrary result. *Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976), cited by the government, upheld the authority of a magistrate to make an initial finding on the substantiality of the evidence supporting a social security determination. The district court judge in *Mathews* was in a position to review meaningfully the recommendations of the magistrate since the record for decision was closed, *i. e.,* the magistrate did not conduct any hearings. As a result, demeanor and veracity were not issues to be determined by the magistrate or the judge. *Compare Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), *with Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

*Campbell v. United States District Court,* 501 F.2d 196 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974), decided before the 1976 amendments, did suggest that it would be constitutional to permit the trial court to accept the magistrate's findings without a new hearing. We believe however that the Ninth Circuit in its subsequent opinion in *United States v. Bergera,* 512 F.2d 391 (9th Cir. 1975), modified the constitutional import of *Campbell* in a way that substantially conforms with our holding here.[10]

Finally, we do not believe that Chief Justice Burger's dissenting opinion in *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2482, 41 L.Ed.2d 879 (1974), advises a contrary conclusion as argued by the government. In *Wingo,* the majority of the Supreme Court determined that the United States Magistrates Act, as then in force, did not permit the district court to refer evidentiary hearings on habeas petitions to magistrates. In a dissenting opinion, the Chief Justice concluded that the Act did permit the reference (as the later amendment now clearly provides). Although he also concluded that so construed, the Act was constitutional, we do not read the Chief Justice's opinion to say that when credibility is essential to the disposition of contested issues the trial court can constitutionally dispense with a hearing. *Id.* at 486–87. That issue was not addressed.

---

10. *See* note 9 *supra.* We also do not read *White v. Estelle,* 556 F.2d 1366 (5th Cir. 1977), to reach a contrary result since the parties apparently raised no constitutional objections to the reference.

We readily accept the Chief Justice's suggestion that the Act's provisions permitting magistrates to conduct hearings on motions to suppress are constitutional. Congress did not require the trial court to determine this case on the basis of a written record alone. We decide only that the district court cannot constitutionally exercise its discretion to refuse to hold a hearing on contested issues of fact in a criminal case where credibility is crucial to the outcome. Whether the district court satisfies this constitutional requirement by prohibiting references of motions to suppress, or simply requires a rehearing of the testimony if an objection is made to a recommended finding, is a matter appropriately resolved by the lower court through its rulemaking power.

The conviction is reversed and remanded for a new hearing on the motion to suppress before the district court judge.