UNITED STATES of America, Appellee,

v.

Benjamin LIEBERMAN,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Jack H. SHAPIRO, Defendant-Appellant.

Nos. 78–1465, 78–1466.

United States Court of Appeals,
First Circuit.

Argued April 5, 1979.

Decided Nov. 7, 1979.

Certiorari Denied Jan. 7, 1980.
See 100 S.Ct. 673.

Harvey A. Silverglate, Boston, Mass., with whom Thomas G. Shapiro and Silverglate, Shapiro & Gertner, Boston, Mass.,

were on brief, for defendant-appellant Benjamin Lieberman.

Peter L. Puciloski, Boston, Mass., with whom Edward J. Barshak, Natasha Lisman, and Sugarman, Rogers, Barshak & Cohen, Boston, Mass., were on brief, for defendant-appellant Jack H. Shapiro.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Giant Stores Corporation, which operated a chain of discount stores in New England, obtained large bank loans and made a successful public offering of common stock in 1972. On June 25, 1973, the Securities and Exchange Commission (SEC) launched a nonpublic investigation into Giant's financial affairs, during which it determined that Giant had defrauded banks and investors by overstating the company's income in financial statements for the fiscal year ending January 29, 1972 (FY 1972). Giant went bankrupt in 1973, and the SEC investigation ultimately led to the indictment of four former officers of Giant for fraud in the sale of securities, for filing false financial statements with two Boston banks and the SEC, and for conspiracy. 15 U.S.C. §§ 77q(a) and 77x, 78m and 78ff; 18 U.S.C. §§ 371, 1001, 1014. Chairman of the Board Theodore Kaufman and Controller. Gerald Silverstein pled guilty. After a jury-waived trial, President Jack Shapiro and Financial Vice-President Benjamin Lieberman were convicted.

The trial judge made detailed special findings. Fed.R.Crim.P. 23(c). At the out-

set, he found that Kaufman, Chairman of the Board, Silverstein, the Controller, Levin, the Assistant Controller, and other employees of Giant overstated the net income of the company by understating the merchandise accounts payable in two ways: (1) by physically removing the accounts payable records from the active files; and (2) by claiming over $1.4 million in phony vendor credits. The court further found that all of the false accounting entries on the company books were made with the knowledge and at the general direction of Lieberman, and that Lieberman actively deceived auditors from Touche, Ross, and Company (Touche Ross), the accounting firm that certified the FY 1972 financial statement.[1] Although finding that Shapiro "operated only at the periphery of this conspiracy," the trial judge was nevertheless persuaded that Shapiro participated in the fraudulent misstatement of income for FY 1972, by assisting in the creation of phony credits.

In their appeal, Shapiro and Lieberman raise four major issues: (1) whether there was a violation of the Jencks Act, 18 U.S.C. § 3500, or of due process of law because the SEC went "off the record" at times during its investigative hearings; (2) whether there was error in the handling and denial of a motion to dismiss for preindictment delay; (3) whether it was an abuse of discretion to deny a subpoena compelling Touche Ross to produce its Giant work papers for FY 1970; and (4) whether the trial judge imposed on defendants the burden of proving a reasonable doubt as to their guilt. Lieberman has concentrated on the first and fourth issues, and Shapiro on the second, which we discuss seriatim.[2]

## THE SEC INVESTIGATION

During its investigation of Giant's financial affairs, the SEC called over fifty wit-

---

1. Concerning the audit by Touche Ross, the trial judge found that the procedures it used were inadequate, that it was under considerable pressure to complete the audit by April 1 (so that a certified financial statement could be filed with the SEC preliminary to an application for the registration of a new stock issue), and that the partner in charge of the audit could not stand up to Lieberman (himself a

former Touche Ross employee). As a result of its certification of Giant's FY 1972 financial statement, Touche Ross was the object of civil suits and SEC administrative proceedings.

2. In their briefs, Shapiro specifically adopted arguments by Lieberman on the first and fourth issues, and Lieberman adopted the "relevant" arguments advanced by Shapiro.

nesses to testify under oath. Before being questioned, each witness was given *Miranda* warnings and advised of the penalties for perjury; many witnesses were represented by counsel. Although stenographers were present to record the testimony given, many times during the proceedings one of the three SEC examiners would order that the proceedings be "off the record." Many volumes of testimony were generated, and transcripts of the hearings were provided to the United States Attorney's office. Some government witnesses reviewed pages of their SEC testimony before appearing in front of the grand jury. After the defendants were indicted, copies of the SEC transcripts were furnished them. Realizing that the defendants would be entitled to this material at the trial under the Jencks Act, 18 U.S.C. § 3500, the prosecutor made it available to defense counsel well in advance of trial.[3]

After receiving and reviewing the first batch of transcripts, which clearly showed that the SEC proceedings went off the record frequently, counsel for Lieberman filed a motion to dismiss the indictment or to suppress the testimony of witnesses who testified before the SEC. Alleging that the SEC examiners intimidated and cajoled the witnesses, suggested what testimony they should give, and cut them off as they were giving exculpatory or nonincriminatory testimony, and that this was accomplished in part by going off the record, Lieberman claimed that potentially exculpatory evidence and Jencks Act material had been effectively destroyed, in violation of the fifth amendment, the Jencks Act, and SEC regulations. Lieberman further asserted that the prejudice he suffered was intensified by lengthy preindictment delay, which caused the memory of witnesses to fade and which would cause their trial testimony to be shaped by the sworn, inculpatory testimony preserved in the SEC transcripts.[4] Subsequently, Lieberman filed an "evidentiary submission" indexing those portions of

the SEC transcripts he felt supported his claims, and further argued that the relief he requested could be granted pursuant to the district court's supervisory powers.

The magistrate to whom Lieberman's motion was assigned held an evidentiary hearing. In an effort to reconstruct what happened off the record, Lieberman called as witnesses four former Giant employees who testified before the SEC, an attorney who had represented a witness before the SEC, and a stenographer who had recorded some of the SEC proceedings. James Palin, Morton Levin, and Kenneth Feeley remembered little of what happened during the off the record breaks in their SEC testimony. Palin recalled only that he may have asked examiners to clarify some questions; Levin thought that sometimes Giant was discussed, documents were reviewed, or the SEC examiners conferred; Feeley remembered some discussions about his personal comfort (he was in a body cast) and some examination of documents. Each of these witnesses denied having been threatened by the SEC examiners, having been encouraged to inculpate Lieberman or discouraged from exculpating him. Attorney Paul Feinberg could recall only one off the record break during which he conferred with his client. Stenographer Jud Geerlings, who usually left the room to smoke during off the record intervals, could say only that SEC proceedings might go off the record more than other agency proceedings because of the large number of documents to be examined.

More informative and helpful to Lieberman was the witness Alphonse Miele, who was able to remember some of what was discussed off the record during his SEC testimony. Miele recalled one off the record interval, following on the record testimony that he saw no credit at Giant that seemed "unusually large," in which the examiner attempted to define an "unusually

---

3. The Jencks Act does not require the government to turn over a statement until the person who made it has testified on direct examination for the government. 18 U.S.C. § 3500(b).

4. This aspect of Lieberman's motion will be discussed in the section of this opinion devoted to preindictment delay.

large" credit. He also remembered telling the examiner off the record that he saw legitimate credits every day at Giant. Miele said there was also some on and off the record discussion of a $3,900 Rozefsky Brothers credit that the examiners suggested to him was phony, but that he had not originally found suspicious. Miele said some of his testimony (particularly about the Rozefsky credit) was met by raised eyebrows, but that no effort was made to keep information helpful to Lieberman off the record.

The government called no witnesses at the magistrate's hearing, but later submitted an affidavit from Richard Patterson, an attorney who conducted the SEC investigation but subsequently went into private practice in Alabama.[5] Patterson stated that it was usual practice for SEC examiners to go off the record during nonpublic investigations, and that he went off the record during the Giant investigation for the following reasons: (1) at the request of counsel for the witness; (2) to discuss a line of questioning with fellow examiners; (3) to clarify a term used in a previous question; (4) to take a recess; (5) to allow a witness to examine a group of documents; (6) to speak with the attorney representing a witness; or (7) to organize his further examination of a witness. Patterson added that he did not preinterview the witnesses who were called to testify, that he made no effort to keep exculpatory evidence off the record, and that "it was [his] policy not to conduct conversations of substance off the record, and certainly not where such conversations were not reflected on the record."

The magistrate recommended denial of Lieberman's motion to dismiss or to suppress the testimony of those who appeared before the SEC. The questions propounded by the SEC examiners struck him as "far from mottos [sic] worthy of trial practice discussion," but he found nothing in the record to indicate that the testimony they developed was "knowingly untrue, distorted, or exaggerated." Although he thought it might have been better practice to keep everything on the record or at least to summarize for the record what occurred off the record, the magistrate saw nothing to indicate that exculpatory evidence was withheld or the defendant prejudiced.[6] Nor did he perceive any violation of the Jencks Act, given that the SEC transcripts had been turned over to defense counsel.

Lieberman pursued his motion unsuccessfully in front of the judge to whom his case was originally assigned,[7] and then renewed it at trial by moving to strike the testimony of the principal government witnesses and for a judgment of acquittal.[8] Most of the trial witnesses who testified before the SEC could not remember the off the record intervals. Collectively, however, they recalled that off the record breaks were taken for some of the reasons listed by Patterson (e. g., to review documents, to confer with counsel, and to obtain clarification of questions). Some of the most significant testi-

---

5. Lieberman's counsel stated at the hearing that he might insist on Patterson's presence after seeing his affidavit. After the affidavit was filed, Lieberman apparently made no effort to have Patterson produced to testify before the magistrate, but did move to strike his testimony. The government opposed the motion to strike on the ground that the affidavit was admissible under Fed.R.Evid. 804(b)(5). No action was ever taken on the motion to strike, and we see no reason to comment on whether it should have been granted. The affidavit stands in evidence.

6. On one hand, the magistrate agreed that knowledge of everything said during the SEC interrogations might have been helpful to the defense, but, on the other hand, he felt that the sheer volume of testimony provided the defense militated against a finding that there was prejudice in the failure to record every word uttered.

7. That judge heard argument on the motion and denied it without stating his reasons. From the hearing transcript it appears the judge thought the motion was premature because it was not clear which witnesses the government would call at trial and whether they would rely on their SEC testimony.

8. At first, the trial judge thought the ruling of the first judge was the "law of the case," but then he agreed that it would be appropriate to consider Lieberman's arguments de. novo.

mony from Lieberman's point of view came from Alphonse Miele, Morton Levin, Alfred Bloom, and Maurice Halperin. Miele, whose pretrial testimony was introduced into evidence, stated unequivocally that matters of "substance" were discussed off the record. Levin admitted that, having been shown certain documents off the record, he changed his testimony on the record to say that certain credits taken by Giant were not legitimate. Al Bloom, another former Giant employee, testified that he used the off the record periods to "ramble" in response to questions, and was able to give a "more succinct" answer when he went back on the record. Maurice Halperin, the head of one of Giant's vendors, stated that during one off the record break, SEC examiners told him that if he did not divulge all of his bank accounts and safe deposit boxes, the information would be subpoenaed. (Halperin then complied.)

In denying Lieberman's motion, the trial judge observed that all witnesses had testified that they were not intimidated or coerced by SEC personnel during off the record discussions. Although the court said it could envision possible abuse of the SEC's off the record practice, it noted that Lieberman had failed "to produce some evidence to rebut the presumption of regularity and put the government to its proof that there was no abuse." Likewise, the court did not believe the Jencks Act required it to strike the testimony of government witnesses who had appeared before the SEC.

We first consider whether, contrary to the opinions of the magistrate and the trial judge, the SEC's off the record proceedings violated the Jencks Act.[9] At first blush, Lieberman's Jencks Act argument seems

fully answered by the words of the Act, which requires the production of any government witness' statement "in the possession of the United States" once the witness has testified on direct, and which defines a "statement" as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a *stenographic*, mechanical, electrical, or other *recording, or a transcription thereof*, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.

18 U.S.C. § 3500(e) (emphasis supplied.)[10] From the statute, it can be argued that the government's only obligation was to turn over whatever "statements" it had in its possession at the relevant time, and that this obligation was met because it turned over everything it had and any *unrecorded* remarks made off the record were not part of a "statement" within the meaning of the Jencks Act.

 The matter is not quite this simple. Cases under the Jencks Act have indicated that the Act calls not only for timely disclosure of statements, but also for the preservation of statements for future disclosure. In *Campbell (I) v. United States*, 365 U.S. 85, 98, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), a majority of the Supreme Court found it unnecessary to decide when destruction of possible Jencks Act material would require sanctions, but failed to adopt the minority view that the Act imposed no duty of preservation, *id.* at 102, 81 S.Ct. 421.[11] Subsequently, the Court implied

---

9. This point received the most emphasis in Lieberman's brief.

10. The statement must, of course, be "relate[d] to the subject matter as to which the witness has testified," 18 U.S.C. § 3500(b). If the government claims that the entire statement does not satisfy this requirement, it must turn the statement over for *in camera* inspection, so that the court can decide whether there are irrelevant portions to excise. 18 U.S.C. § 3500(c).

11. Justice Frankfurter, in a concurring and dissenting opinion joined by three other justices, said that the history of the Jencks Act did not suggest that Congress intended to require the government to preserve all records and notes taken during countless interviews, and specifically rejected the argument that the statutory language "in the possession of" meant "possession at any prior or present time." *Campbell (I) v. United States*, 365 U.S. 85, 102, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). In our own *Camp-*

there was some duty to preserve, holding that the destruction of an F.B.I. agent's notes was not impermissible as long as the data in them had been incorporated in another document and the notes had been destroyed in good faith and in keeping with general practice. *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). *See also United States v. Augenblick,* 393 U.S. 348, 355–56, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) (government had duty of producing tapes covered by Jencks Act, or explaining why it could not do so). Lower courts have held that the intentional destruction, even in good faith, of a government witness' statement can violate the Jencks Act and warrant sanctions. *E. g., United States v. Bufalino,* 576 F.2d 446, 448–50 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) (although no sanctions imposed for the destruction of backup tapes of drug transactions, deliberate destruction of Jencks material will ordinarily call for sanctions in the future); *United States v. Well,* 572 F.2d 1383, 1384–85 (9th Cir. 1978) (routine destruction of interview tapes justified a mistrial and suppression of testimony), *United States v. Carrasco,* 537 F.2d 372, 375–77 (9th Cir. 1976) (routine good faith destruction of informant's diary called for a new trial); *United States v. Bryant,* 142 U.S.

App.D.C. 132, 140–143, 439 F.2d 642, 650–53 (D.C. Cir.) (negligent or bad faith nonpreservation of tapes of a drug transaction might call for sanctions; remanded), *appeal after remand,* 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971); *Lee v. United States,* 125 U.S.App.D.C. 126, 129–130, 368 F.2d 834, 837–38 (D.C. Cir. 1966) (testimony of agents whose reports had been destroyed in the ordinary course of business should have been stricken); *United States v. Lonardo,* 350 F.2d 523, 527–30 (6th Cir. 1965) (deliberate destruction of stenographic transcripts required mistrial). *Compare, e. g., United States v. Miranda,* 526 F.2d 1319, 1328–29 (2d Cir. 1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976) (inadvertent or negligent, nonprejudicial loss of tape of drug transactions did not warrant sanctions); *United States v. Perry,* 153 U.S.App. D.C. 89, 94–98, 471 F.2d 1057, 1062–66 (D.C. Cir. 1972) (unintentional, nonnegligent loss of grand jury minutes would not justify sanctions; remanded).[12]

Relying upon some of these cases and others,[13] Lieberman contends that the government violated its duty to preserve Jencks Act material by failing to record all that was said before the SEC. We think it is appropriate to assume that some of what was said during the off the record breaks

*bell* opinions following remand from the Supreme Court, we doubted the existence of a duty to preserve Jencks Act material, although we put to one side cases involving bad faith destruction. *Campbell v. United States,* 296 F.2d 527, 531–32 & n.8 (1st Cir. 1961), and 303 F.2d 747, 751 (1st Cir. 1962). When the case went to the Supreme Court for a second time, the Court again did not reach the issue whether any sanction would attach to the destruction of the notes in question. *Campbell (II) v. United States,* 373 U.S. 487, 491 & n.5, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963).

**12.** The rationale expressed for sanctions for the intentional destruction of Jencks Act material (but not less culpable behavior) was either that they are necessary to prevent circumvention of the Jencks Act (and Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), or that destruction of a witness' statement is an "elec[tion] not to comply" with the Act that requires striking the witness' testimony or declaring a mistrial, 18 U.S.C. § 3500(d).

**13.** Analogizing his case to one in which a government agent destroys rough notes of an interview of a witness after writing up a report, Lieberman also relies on *United States v. Harrison,* 173 U.S.App.D.C. 260, 524 F.2d 421 (D.C. Cir. 1975), which condemned this F.B.I. procedure. Although the third and ninth circuits have followed *Harrison, United States v. Vella,* 562 F.2d 275, 276 (3d Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); *United States v. Harris,* 543 F.2d 1247, 1248 (9th Cir. 1976), other circuits have taken a different view. *See* cases collected in *Harrison, supra,* 173 U.S.App.D.C. at 269, 524 F.2d at 430 n.25. Because the *Harrison* holding was based upon Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we do not find it particularly enlightening on the Jencks Act issue in this case, and we need not consider whether we would follow *Harrison* or adhere to the views we expressed in *Campbell v. United States,* 296 F.2d 527, 531–32 & n.8 (1st Cir. 1961).

would have qualified as Jencks Act material had it been recorded.[14] But, as the government points out, in all of the cases cited by Lieberman, "[s]omething was destroyed rather than not recorded or made." Lieberman, however, sees no material difference between the destruction of existing Jencks Act material and the refusal to record it in the first place, and contends that going off the record violates the Jencks Act just as much as editing a full transcript of the SEC proceedings would.

We are not persuaded. What Lieberman would have us hold is that there is not only a duty to preserve whatever material comes into the government's hands, but also a duty to create Jencks Act material by recording everything a potential witness says, at least if some of it is memorialized.[15]

In the first place, such a holding would be at odds with one of our previous decisions. In *Campbell v. United States*, 296 F.2d 527, 531–32 (1st Cir. 1961), on remand from the Supreme Court, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), we rejected a suggestion that the F.B.I. had a duty under the Jencks Act not only to preserve notes, but "always to take notes, so that a record might be there to be kept."

 Moreover, it stretches the language of the Jencks Act too far to read it to require complete recordation of a statement without regard to its length or the circumstances in which it is made. The statute speaks in terms of turning over "statement[s]" "in the possession of the United States." 18 U.S.C. § 3500(b). When all that a witness said was recorded and then wholly or partly destroyed, it was at least once contained in a "statement" "in the possession of the United States." 18 U.S.C.

§ 3500(e). When some of what a witness said was not recorded, however, it was never part of a "statement" within the meaning of the Jencks Act (and was arguably never "in the possession of the United States" either).

 Apart from the language of the Jencks Act, nothing in the legislative history or in the case law that has been called to our attention persuades us to adopt Lieberman's position. We are left with the conviction that Congress would not have expected an interpretation of the Jencks Act that would bar off the record discussions during SEC or other agency proceedings. No court has gone as far as Lieberman would have us go; as the Fifth Circuit stated in an analogous context (the selective recording of grand jury testimony), "no part of the Jencks Act has ever been construed to require the government to *develop* potential Jencks Act statements" (emphasis added). *United States v. Head*, 586 F.2d 508, 511–12 (5th Cir. 1978), quoting from *United States v. Cruz*, 478 F.2d 408, 411 (5th Cir. 1973). We do not say that there may never be a Jencks Act violation in failing to record a discussion with a potential witness. But absent any specific indication that agency officials were engaged in manipulative or coercive conduct, we think that proceedings should be presumed to have been conducted with regularity, that is, with any off-the-record discussions being for wholly proper purposes.

 We next consider Lieberman's contention that the SEC procedures and the use to which the transcripts were subsequently put by the prosecution violated his right to due process of law and call for the exercise of this court's supervisory powers.[16]

---

14. No contrary finding was made below, and there was, among other things, testimony by Miele that matters of substance were discussed by him and testimony by Bloom that he "ramble[d]" in response to questions about Giant Stores.

15. Lieberman carefully avoids asserting that the SEC is obligated to record its interrogations, arguing only that as long as it elects to record them, *full* statements must be taken and provided.

16. This argument is not as carefully fleshed out as Lieberman's Jencks Act argument. Taking what may be termed a "kitchen sink" approach, Lieberman contends he was deprived of a fair trial by a combination of fourteen factors haphazardly listed in his brief: (1) the hundreds of off-the-record discussions before the SEC; (2) the suspicious circumstances of these off-the-record breaks, coupled with direct evidence of SEC "suggestiveness, badgering and outright coercion"; (3) the fact that only

Lieberman's major complaint is that the SEC examiners badgered and coerced witnesses and made suggestive remarks to them off the record.[17] Having reviewed the district court testimony of witnesses who testified before the SEC and the SEC transcripts themselves, we see nothing rising to the level of a due process violation. It does appear, even from the record passages, that the SEC examiners often asked leading questions and sometimes disclosed their own point of view to the witnesses. To us, this alone does not offend the due process clause, however desirable blander questioning might have been. *See generally Hannah v. Larche*, 363 U.S. 420, 446–48, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (dictum) (due process does not require that SEC investigations be conducted like trials). We are not convinced that anything more sinister occurred. Many of the off the record breaks seemed to have been for the innocu-

ous purposes cited in the Patterson affidavit, *e. g.*, for the examination of documents, for discussions between a witness or an SEC examiner and the witness' counsel, and for conferences between examiners. Although we do think that discussions of substance took place during some off the record proceedings, perhaps when the witness asked that a question be clarified, we are simply unable to tell what occurred during other off the record intervals. We are unable to conclude that the witnesses before the SEC were coerced into giving inculpatory evidence or that exculpatory evidence was stifled. The testimony given in the district court was to the contrary, and the SEC transcripts are not as inherently suspicious as Lieberman makes them out to be.[18] Misconduct of constitutional proportions at the SEC simply does not show forth from the record.[19]

17. Lieberman also argues in passing that the SEC violated its own rules by going off the record. We do not read the applicable rule, 17 C.F.R. § 203.6, to require recording of everything said during an SEC investigation, and, therefore, we cannot conclude that the SEC deprived Lieberman of due process by failing to follow its own published rules. *See United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970).

an SEC examiner could order the stenographer to go off-the-record; (4) the government's failure to justify the off-the-record procedure; (5) Lieberman's difficulty in reconstructing what occurred during the off-the-record breaks; (6) the government's failure to justify the long preindictment delay; (7) the defendant's efforts to obtain pretrial relief; (8) the government's use of the SEC transcripts to prepare witnesses for trial and "lock in" their SEC testimony; (9) the complexity of the issues and the witnesses' motivation to inculpate high Giant officials; (10) the witnesses' faded memories and reliance on the SEC transcripts; (11) witnesses' reluctance to deviate from their SEC testimony; (12) the impossible burden placed on Lieberman to prove what happened off the record; (13) the fact that the government's evidence against Lieberman was essentially testimonial; and (14) Lieberman's difficulty in obtaining certain documents from the SEC and Touche Ross. The cases Lieberman cites in conjunction with this listing relate almost exclusively to whether and when the government should be required to record grand jury proceedings fully, and do not seem to us particularly apposite.

18. For example, comparing Miele's district court and SEC testimony convinces us that SEC examiners were openly skeptical of what he had to say about Giant's credits and eventually persuaded him to be suspicious of the credits, but not that they coerced Miele or buried information useful to Lieberman off the record. Halperin's district court testimony that he was warned off the record that a subpoena could issue for his personal records does not demonstrate to us that he was threatened, much less that evidence inculpatory of Lieberman was improperly extracted by the SEC staff.

19. Because we have undertaken our own review of the SEC proceedings to see if due process was violated, we need not dwell on Lieberman's claim that the trial judge saddled him with an impossible burden of proving what occurred off the record and that the SEC staff acted outrageously toward each of the witnesses whose testimony he wanted stricken (in the obviously hyperbolic terms used by the trial judge, that "there was somebody standing by rolling pieces of bamboo ready to go under the fingernails of the witness"). It suffices to say that, in general, a defendant bears the burden of proving that his conviction was obtained in violation of due process, *see Woodcock v. Amaral*, 511 F.2d 985, 988 (1st Cir. 1974), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975), and that here we see nothing unfair in expecting Lieberman to have shown enough of what occurred off the record to permit an inference that his rights were violated.

Perceiving no due process violation in the SEC investigation, we do not accept Lieberman's further argument that the prosecutor's use of the SEC transcripts to prepare government witnesses to testify before the grand jury and at trial violated his rights. Lieberman complains bitterly that, after preindictment delay had allowed memories to fade, the transcripts were used to "lock in" the testimony of witnesses. In the absence of solid evidence that the testimony of witnesses who appeared before the SEC had been significantly and improperly shaped and trimmed, we see nothing fundamentally unfair about allowing them to review their previous statements. Nor do Lieberman's additional allegations—e. g., that many of the witnesses disliked him and were motivated to inculpate him,[20] that most of the evidence against him was testimonial, and that the line between guilt and innocence (or between liberal and fraudulent accounting) was subtle—create a total picture violative of due process of law.

Finally, we reject Lieberman's argument that, in the peculiar circumstances of this case, we should exercise our supervisory powers to reverse his convictions. Our supervisory powers are to be used sparingly. See *Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). We would be reluctant to exercise them to overturn a conviction that was not the product of manifestly improper conduct by federal officials, *id.* at 440; *see United States v. Shelton*, 588 F.2d 1242, 1246 (9th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); *United States v. Jones*, 140 U.S.App.D.C. 70, 76, 433 F.2d 1176, 1182 (D.C. Cir. 1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971). For the reasons already stated, we are unable to conclude such misconduct occurred here.

## PREINDICTMENT DELAY

We now turn our attention to the issue of preindictment delay. The chronology of events was as follows:

1. June 25, 1973—SEC commences its investigation.

2. November 20, 1974—all witnesses except two have testified before the SEC.

3. July 3, 1975—the last two witnesses have testified before the SEC.

4. August 1, 1975—SEC staff's preliminary recommendations.

5. Spring, 1976—SEC informally contacts the United States Attorney's office in Boston.

6. August 4, 1976—SEC staff's final recommendations favoring injunctive and administrative proceedings.

7. September 2, 1976—SEC commences a civil action against various defendants, including Lieberman and Shapiro, in federal district court in Washington, D.C.; SEC institutes administrative proceedings against Touche Ross.

8. September 3, 1976—consent decree entered in the civil action.

9. October, 1976—SEC formally refers the case to the United States Attorney's office.

10. January 26, 1977—grand jury investigation begins.

11. April 20, 1977—indictment returned.

Since almost four years elapsed from the initiation of the SEC investigation to indictment, Shapiro moved to dismiss the indictment primarily because of preindictment delay.[21] At the hearing before the magistrate on his motion, Shapiro called Donald

---

**20.** Lieberman plausibly argues that middle echelon employees at Giant could have gotten the impression from the SEC staff that they would fare better if they testified against high echelon Giant employees such as Lieberman. Indeed, counsel for Robert Wesley McDonough obtained a letter from SEC examiner Patterson that indicated McDonough might be treated as a witness rather than a defendant if he were knowledgeable about the fraud because he was ordered by higher officials to carry it out. We agree with the trial judge that the SEC's preference for prosecuting high officers of Giant, even if it was communicated to lower echelon employees, was not of itself uncommon, shocking, or improper.

**21.** It is conceded that the indictment was returned before the statute of limitations had run.

Bonacci to testify in an attempt to show that the delay had prejudiced him. Bonacci, who was a vice-president at Giant from July, 1972, to August, 1973, testified that he was something of a "house shrink" in whom some Giant employees confided. Interested in writing a case study or a book about management techniques, Bonacci began, in November, 1972, to tape record at night his recollections of events that transpired at Giant. Recorded on these tapes was his best, most detailed memory of conversations he had with Shapiro and three government witnesses who testified against Shapiro at the SEC investigation: Gerald Silverstein, Richard Lesser, and Robert Wesley McDonough. At the time of the magistrate's hearing, Bonacci was still able to remember the substance of some of these conversations. He said that, during the 40–50 conversations he had with Shapiro, Shapiro complained that he was being kept in the dark about the financial affairs of the company and admitted no wrongdoing. He also recalled a meeting at which Silverstein threatened to implicate Shapiro in the 1972 financial fraud if he were not promoted to vice-president and given a substantial raise. Bonacci also remembered that Lesser, a merchandise manager, started out by saying that Shapiro told him to get as many credits as he could, and only later alleged that Shapiro told him to get phony credits. Bonacci, however, recalled that McDonough, director of advertising sales, always gave a consistent, inculpatory version of Shapiro's involvement in the company finances. Bonacci said he offered his tapes to SEC investigators in May, 1973, but they rejected the offer, saying the tapes were worthless hearsay. In October, 1974, while on an emergency assignment for his new employer, Bonacci erased these recollections by recording over the tapes. By the time an SEC lawyer requested the tapes in December, 1976, Bonacci's recollections had been destroyed.

The only other witness called by Shapiro was Allen Bornheimer, an attorney with whom Shapiro consulted when he reported irregularities in the FY 1972 statement to two Boston banks and the SEC. Bornheimer stated that Shapiro had exculpated himself in their discussions and that the SEC had never contacted him, although Shapiro had waived his attorney-client privilege with respect to their conversations. Shapiro also established by affidavit that the SEC had declined his offer to take a lie detector test.

The magistrate recommended denial of Shapiro's motion to dismiss. He agreed that the Bonacci tape recordings would have been a valuable aid to defense counsel in preparing to cross-examine government witnesses and in helping Bonacci to refresh his recollection. Nevertheless, he concluded that the unavailability of the tapes did not establish "sufficient prejudice to trigger due process considerations"—first, because Bonacci would be called as an impeaching witness (and then only if Lesser and Silverstein denied making certain statements to him), and, second, and more important, because Bonacci still possessed a recollection of the substance of the important conversations from Shapiro's point of view.

Claiming that the magistrate's proposed findings were deficient, Shapiro asked for and was granted a hearing on his objections before the judge to whom the case was originally assigned. At the hearing, no further evidence was taken; Shapiro argued that the magistrate should have made further findings, especially concerning the SEC's rejection of his offers to waive his attorney-client privilege and to take a lie detector examination, and should have recommended dismissal of the indictment. The district judge denied Shapiro's motion to dismiss without stating his reasons.

 Shapiro contends, at the outset, that the manner in which his motion was handled was improper. This contention does not detain us long. Although Shapiro now complains that the magistrate was not authorized by local rules to hear his motion, he did not object to the referral of his motion to the magistrate. We see no reason to consider the objection for the first time on appeal, since the magistrate was not improperly designated as the final arbi-

ter of the motion and made no credibility judgments.[22] *Cf. Cruz v. Hauck,* 515 F.2d 322, 326–30 (5th Cir. 1975), *cert. denied sub nom. Andrade v. Hauck,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976) (plaintiffs waived their right to object to reference of civil case to a magistrate who sat as a special master). Shapiro has criticized throughout the magistrate's proposed findings as incomplete, but, even if there was anything amiss in his failure to make each and every finding Shapiro requested, we think Shapiro was unharmed because the entire record developed by the magistrate was, in any event, available to the judge to whom objections about the findings were made.[23] *See Moran v. Hogan,* 494 F.2d 1220, 1223 (1st Cir. 1974). Despite Shapiro's insistence that the judge in issuing no further findings or opinion of his own, abdicated to the magistrate his responsibility to decide the motion, we think he fulfilled his obligation to make "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," 28 U.S.C. § 636(b)(1)(C), by hearing argument on Shapiro's objections with the record developed by the magistrate available to him.[24] The First Circuit cases relied upon by Shapiro involved a judge's adoption of a magistrate's report without holding any hearing on objections to it and were decided before a 1976 amendment to 28 U.S.C. § 636(b)(1)(B) made it plain that a magistrate had authority to hold an evidentiary hearing. *O'Shea v. United States,* 491 F.2d 774 (1st Cir. 1974), *disapproved on other grounds, Wingo v. Wedding,* 418 U.S. 461, 473 n.19, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); *Reed v. Board of Election Commissioners of City of Cambridge,* 459 F.2d 121 (1st Cir. 1972); *Rainha v. Cassidy,* 454 F.2d 207 (1st Cir. 1972).[25]

22. We doubt the objection has merit in any event. It is true that at the time the motion to dismiss was heard, the district court was operating under rules that did not provide for hearings by magistrates on motions to dismiss. Rules 2 and 6 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, promulgated November 5, 1974. But, the 1976 amendments to 28 U.S.C. § 636 expressly authorized judges to designate a magistrate to hear and make proposed findings and recommendations on a motion to dismiss an indictment, 28 U.S.C. § 636(b)(1)(B), and we are not altogether convinced further authorization by local rule was required, *compare* 28 U.S.C. § 636(b)(4) (1976) (requiring courts to establish rules "pursuant to which the magistrates shall discharge their duties") *with* 28 U.S.C. § 636(b) (1968) (permitting district courts to authorize the assignment of additional duties to magistrates by rule). The local rules have now been revised to reflect the 1976 amendments. Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, promulgated February 12, 1979.

23. Shapiro specifically takes issue with the magistrate's failure to make certain findings about the preindictment delay and the SEC's indifference to his offers to waive his attorney-client privilege and to take a lie detector test. Although reference to these matters may have been in keeping with the magistrate's obligation to furnish a full accounting of all "argumentatively relevant matters," *O'Shea v. United States,* 491 F.2d 774, 777 (1st Cir. 1974), *disapproved on other grounds, Wingo v. Wed-*

*ding,* 418 U.S. 461, 473 n.19, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), this is not a case where "a magistrate's summary opinion prevented the district court from considering facts and arguments that might have altered the final decision." *Moran v. Hogan,* 494 F.2d 1220, 1223 (1st Cir. 1974).

24. *Shapiro makes much of the judge's alleged failure to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate" or to "receive further evidence or recommit the matter to the magistrate with instructions." But 28 U.S.C. § 636(b)(1)(C) provides only that the judge may take such actions, and we think the judge in effect "accept[ed]" the magistrate's findings and recommendations.*

25. This case is also unlike *United States v. Raddatz,* 592 F.2d 976 (7th Cir. 1979), in which the Supreme Court recently granted certiorari, —— U.S. ——, 100 S.Ct. 44, 62 L.Ed.2d 30 (1979). *Raddatz* held that, where the credibility of witnesses was crucial to the outcome of a motion to suppress and a magistrate credited the testimony of government witnesses in recommending the denial of the motion, the district court denied the defendant due process by adopting the magistrate's recommendation without holding an evidentiary hearing. Here, the magistrate made no such critical credibility judgments. Also, in *Raddatz,* the defendant apparently objected below to the procedure employed by the judge, *id.* at 983, but here Shapiro did not object to the initial reference to

902

The real question is whether Shapiro's motion to dismiss should have been granted on the merits. We conclude that its denial was proper.

 It is established that, since statutes of limitations are the primary safeguards against overly stale criminal charges, the due process clause has a limited role to play in protecting against oppressive pretrial delay. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 322–24, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). To determine whether due process requires dismissal of a delayed indictment, a court must first consider whether the delay caused the defendant actual prejudice, and then evaluate the reasons for the delay.

> [P]roof of actual prejudice makes a due process claim concrete and ripe for adjudication . . . . [P]roof of prejudice is generally a necessary but not sufficient element of a due process claim . . . . [T]he due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

*United States v. Lovasco, supra,* 431 U.S. at 789–90, 97 S.Ct. at 2048–49, interpreting *United States v. Marion, supra,* 404 U.S. at 324–26, 92 S.Ct. 455. As Shapiro concedes, the burden of proving actual prejudice is with the defendant. *E. g., United States v. King,* 560 F.2d 122, 131 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); *United States v. Mays,* 549 F.2d 670, 677 (9th Cir. 1977); *Schlinsky v. United States,* 379 F.2d 735, 737 (1st Cir.), *cert. denied,* 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967). What the defendant must show is that his defense has been impaired. *E. g., United States v. Pallan,* 571 F.2d 497, 501 (9th Cir.), *cert. denied,* 436

U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978); *United States v. Barket,* 530 F.2d 189, 193 (8th Cir. 1976).

 This Shapiro fell short of doing. True, Shapiro did something more than make an unsupported claim that witnesses' memories had faded, *United States v. Marion, supra,* 404 U.S. at 326, 92 S.Ct. 455, or that witnesses or evidence had been lost that might have been helpful to him, *United States. v. Pallan, supra,* at 501. Before the magistrate, Shapiro did establish that Bonacci's memory of the exact wording and timing of certain conversations had actually faded and that the lost tapes would have helped refresh his memory. But, the extent to which Bonacci's ability to impeach Silverstein and Lesser was reduced remained difficult to gauge and whether the defense would actually be handicapped remained open to considerable doubt. As it turned out, the evidence that persuaded the trial judge to find Shapiro guilty did not come from Silverstein and Lesser, the substance of whose statements Bonacci related, but from Robert Wesley McDonough and Linda Jewett (Lieberman's secretary), witnesses about whom Bonacci never claimed to have any impeaching information.[26]

In short, we do not think Shapiro made a "showing of prejudice sufficient to support a deeper due process inquiry under *Lovasco*" into the reasons for the preindictment delay. *United States v. Ramos Algarin,* 584 F.2d 562, 567 (1st Cir. 1978). We add that the destruction of the Bonacci tapes occurred while the SEC proceedings were ongoing, during a period of investigative delay in which the Supreme Court has held some prejudice can be tolerated. *United States v. Lovasco, supra,* 431 U.S. at 796, 97 S.Ct. 2044. Furthermore, much, if not all,

---

a magistrate or request an evidentiary hearing before the district judge.

**26.** In his special findings, the trial judge made it plain that he convicted Shapiro on the strength of testimony by McDonough and Jewett, which he concluded "beyond a reasonable doubt" was "substantially true." As noted in the findings, McDonough testified that Shapiro told him he had to dig up advertising credits in

order to save the company and said everyone had to make a moral judgment and consider what was best for the company; Jewett testified that Shapiro had her type up a Millbrook Distributors credit memo, which, the court found, showed a phony credit of $257,000. The trial judge also stated in his findings that Shapiro did not strike him as "altogether forthright" in his testimony.

of the delay prior to indictment appears justified by the length of the SEC's investigation,[27] the prosecutor's need to review the complex case, and the grand jury's own proceedings. Although the ill-explained period between August 1, 1975 (when the SEC investigation was complete and the staff's preliminary recommendation made), and October, 1976 (when the case was formally referred to the United States Attorney's office), is of concern, it looks from the record as though the SEC decided to pursue civil remedies before referring the case for possible criminal prosecution.[28] We cannot say that this would be unreasonable. *United States v. Naftalin,* 534 F.2d 770, 774 (8th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976). *See United States v. United States Gypsum Co.,* 550 F.2d 115, 118 (3d Cir. 1977), *cert. denied sub nom. Brown v. United States,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1161 (1978).

We are also unpersuaded by Shapiro's argument that additional factors combined with the delay to deny him due process of law. For example, it seems to us that, in spurning the original offer by Bonacci of his types, the SEC examiners were, at most negligent,[29] *see United States v. Smyth,* 556 F.2d 1179, 1182 n.7 (5th Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977), and that, in deciding to appraise Shapiro's credibility without having him take a lie detector test or hearing from his former counsel, the SEC was acting within its discretion. Although Shapiro complains that the SEC investigators induced witnesses to give inculpatory testimony and aborted exculpatory evidence, this claim has no

more force or substantiation than the similar claim by Lieberman. Viewing "the whole course of the proceedings," as Shapiro requests, we do not detect government conduct that so violated "the community's sense of fair play and decency" as to deprive him of due process of law. *Rochin v. California,* 342 U.S. 165, 169, 173, 72 S.Ct. 205, 208, 210, 96 L.Ed. 183 (1952).

Lieberman's preindictment delay claim fares no better than Shapiro's. Like Shapiro, Lieberman did not show that the delay caused actual prejudice to his defense. Lieberman's major claim of prejudice was that the passage of time had dulled the memory of witnesses, making it difficult for him to reconstruct what occurred during the off the record proceedings at the SEC. Although he was able to show that many witnesses indeed had difficulty remembering the breaks, he did not show that they had likely forgotten information that would have buttressed his claim that the conduct of the SEC examiners deprived him of due process of law. We suspect the contrary—that if witnesses had been as bullied as Lieberman claimed, some of them or their lawyers would have remembered. Lieberman also claims that the delay contributed to his inability to obtain financial records of Giant vendors, because many vendors destroyed their records after seven years. Whether such records would have advanced Lieberman's defense (e. g., by impeaching testimony that certain credits were never authorized or by showing that credits were commonly given and Lieberman could have believed some were valid) is purely a matter of speculation.[30] *United States v. Smyth,*

---

27. It is true that all but two of the witnesses called by the SEC had testified by the end of November, 1974. Much of the period until August, 1975, when the staff made its recommendations, may have been devoted to digesting the large quantity of testimonial and documentary evidence received.

28. The prosecutor's affidavit mentions that negotiations with prospective civil defendants took place during this period, and the magistrate's findings indicate that a consent decree was entered one day after a civil suit was filed.

29. Although it seems fair to assume that the tapes would not have been lost to Shapiro if the

SEC had accepted Bonacci's offer, it also must be pointed out that Shapiro might have asked for the tapes himself before they were destroyed. Bonacci testified that Shapiro knew he was making tapes, and from the record it is clear that Shapiro knew he was under investigation before the tapes were destroyed in October, 1974.

30. Records made seven years before the indictment was returned in 1977 would not directly relate to Giant's FY 1972, which was largely part of calendar year 1971. Two vendors said at the time of trial that they had destroyed records from calendar years 1969 and 1970.

*supra,* 556 F.2d at 1182. There was no error in the failure to dismiss the indictment against Lieberman for preindictment delay, which appears to have been largely justified.

### THE SUBPOENA FOR TOUCHE ROSS PAPERS

The next issue is whether the district court erred in denying Lieberman access to Touche Ross' work papers for its audit of Giant in FY 1970. Prior to trial, Lieberman sought production of Touche Ross' FY 1969–1973 Giant audit work papers pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure.[31] After the government agreed to produce work papers from FY 1972 and 1973, the magistrate ordered Touche Ross to produce the FY 1970 and 1971 work papers. As a result of an appeal by Touche Ross, the judge to whom the case was first assigned limited the subpoena to the 1971 work papers.

The enforcement of a pretrial subpoena duces tecum is committed to the sound discretion of the district court. *United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Bearden,* 423 F.2d 805, 809 (5th Cir.), *cert. denied,* 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970). The moving party must show, among other things, that the material he seeks is evidentiary and relevant. *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y. 1952), cited in *United States v. Nixon, supra,* 418 U.S. at 699, 94 S.Ct. 3090.

Lieberman contended below that the FY 1970 work papers would have established that vendor credits were on Giant's books before he joined Giant in the fall of 1970 and, therefore, would have shown he was not the author of the 1972 credits and had no reason to suspect any were fraudulent. But the existence of credits in FY 1970 would not have excluded Lieberman's involvement in the FY 1972 fraud, and Lieberman in any event was given access to records for FY 1971, which, according to him, showed that credits had been given that year. In these circumstances, we cannot say that it was an abuse of discretion to limit the subpoena to records from the later time period. *See United States v. Iozia, supra,* at 338–40. *See generally* 1 C. Wright, *Federal Practice and Procedure* § 275 at 560–61 (1969 ed.), stating that, although a ruling quashing a subpoena is appealable after conviction, the trial court has so much discretion in this area that reversal is unlikely.[32]

### THE BURDEN OF PROOF BEYOND A REASONABLE DOUBT

Lieberman's final contention is that the trial judge erroneously imposed upon him the burden of creating a reasonable doubt about his guilt. This claim focuses on the trial judge's refusal to "instruct himself," as the finder of fact, in the following terms proposed by Lieberman: "The defendant does not have any duty to create a reasonable doubt or to establish a reasonable doubt. It is not the function of the

---

**31.** The Rule provides:

A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

Fed.R.Crim.P. 17(c).

**32.** The government contends that this issue was waived by Lieberman's failure to issue a trial subpoena for the FY 1970 work papers. We note, however, that after learning that two vendors had destroyed their records for 1969 and 1970, Lieberman advised the trial judge that he was still interested in Touche Ross' FY 1970 work papers, and the trial judge said he was not inclined to disturb the order limiting the subpoena. Although we think this rather informal discussion with the trial judge cuts against a finding that Lieberman waived his request for the FY 1970 papers, neither do we think it presents us with the question whether the trial judge would have been warranted in quashing a trial subpoena.

defendant's evidence to raise a reasonable doubt as to the defendant's guilt." In refusing to adopt the second sentence of this proposed ruling of law, the trial judge remarked that, although the defense did not have to introduce evidence to raise a reasonable doubt, he could see no other function that the defendant's evidence would have other than that of raising a reasonable doubt.

To Lieberman, this demonstrates that the trial judge harbored the same misconception about burden of proof as he conveyed in the case of *United States v. Harrigan*, 586 F.2d 860 (1st Cir. 1978). In *Harrigan*, we found reversible error in the following instruction to the jury: "[T]he defendant's evidence has no greater function than simply to raise a reasonable doubt in your minds, if it does. The defendant is not required to go any further." This instruction, along with similar remarks during the prosecutor's summation, gave the impression to the jury that the defendant had some burden to establish doubt in their minds. *Id.* at 862.

There are, however, salient differences between this case and *Harrigan. Harrigan* was a jury case. The court's instruction came hard on the heels of a statement by the prosecutor in which he asked the jury if they were convinced that *the defendant had proven* that another person was the real offender (the bookmaker). The only way the court's statement could be construed was that the defendant had to prove there was a reasonable doubt by the evidence he introduced. There was not the interchange between the court and counsel as here, where the court made it clear that it understood fully that the government had to prove the defendant guilty beyond a reasonable doubt:

Then the context I gave it, that's the only proof. That's also my feeling. The defendant has no burden of proof and the only function of the defendant's evidence is to raise a reasonable doubt.

. . . . .

If I were to do so [accept the requested instruction], I would then be led to either one of two conclusions, that the function of the defendant's evidence is to satisfy some burden of proof, which is plainly wrong, or that it has no function at all, in which case, I would be obliged to disregard it, which would be equally wrong.

So that I cannot accept your instruction without doing serious injustice to the *defendant* in the case.

(emphasis added).

It is clear to us from reading the entire colloquy between the court and counsel that each ascribed a different meaning to the words "function of the evidence." Defense counsel interpreted the phrase to mean burden of proof. We think the court meant that if the defendant chose to introduce evidence, the purpose obviously was for the court to consider it in determining whether the government had proven the defendant guilty beyond a reasonable doubt. Other remarks by the trial judge in the course of the trial, when read in context, are wholly in keeping with his proper understanding of the allocation of the burden of proof.[33]

Our review of defendants' claims and the record as a whole has convinced us that there was no error warranting dismissal of the indictment or a new trial. *The convictions of Jack Shapiro and Benjamin Lieberman are therefore affirmed.*

---

**33.** *E. g.*, the following exchange during the testimony of one government witness:

THE COURT: Now, the question of what you have to prove, of course, is not the issue at all. As you correctly state, you don't have to prove anything. But you do, if you're trying to undercut the government's proof by some sort of positive assertion, why, it has to be a positive assertion that is persuasive.

MR. SHAPIRO: Yes, your Honor.

THE COURT: And the purpose of my questioning is to find out whether your positive assertion is persuasive enough.